# UNITED STATES *v.* WILLIAMS

No. 90–1972.  Argued January 22, 1992—Decided May 4, 1992

SCALIA, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, KENNEDY, and SOUTER, JJ., joined. STEVENS, J., filed a dissenting opinion, in which BLACKMUN and O'CONNOR, JJ., joined, and in Parts II and III of which THOMAS, J., joined, *post*, p. 55.

*Solicitor General Starr* argued the cause for the United States. With him on the briefs were *Assistant Attorney General Mueller, Deputy Solicitor General Bryson,* and *Michael R. Dreeben.*

*James C. Lang* argued the cause for respondent. With him on the brief were *G. Steven Stidham, Joel L. Wohlgemuth,* and *John E. Dowdell.**

JUSTICE SCALIA delivered the opinion of the Court.

The question presented in this case is whether a district court may dismiss an otherwise valid indictment because the

---

**Dan Marmalefsky* filed a brief for the National Association of Criminal Defense Lawyers as *amicus curiae* urging affirmance.

Government failed to disclose to the grand jury "substantial exculpatory evidence" in its possession.

## I

On May 4, 1988, respondent John H. Williams, Jr., a Tulsa, Oklahoma, investor, was indicted by a federal grand jury on seven counts of "knowingly mak[ing] [a] false statement or report . . . for the purpose of influencing . . . the action [of a federally insured financial institution]," in violation of 18 U. S. C. § 1014 (1988 ed., Supp. II). According to the indictment, between September 1984 and November 1985 Williams supplied four Oklahoma banks with "materially false" statements that variously overstated the value of his current assets and interest income in order to influence the banks' actions on his loan requests.

Williams' misrepresentation was allegedly effected through two financial statements provided to the banks, a "Market Value Balance Sheet" and a "Statement of Projected Income and Expense." The former included as "current assets" approximately $6 million in notes receivable from three venture capital companies. Though it contained a disclaimer that these assets were carried at cost rather than at market value, the Government asserted that listing them as "current assets"—i. e., assets quickly reducible to cash—was misleading, since Williams knew that none of the venture capital companies could afford to satisfy the notes in the short term. The second document—the Statement of Projected Income and Expense—allegedly misrepresented Williams' interest income, since it failed to reflect that the interest payments received on the notes of the venture capital companies were funded entirely by Williams' own loans to those companies. The Statement thus falsely implied, according to the Government, that Williams was deriving interest income from "an independent outside source." Brief for United States 3.

Shortly after arraignment, the District Court granted Williams' motion for disclosure of all exculpatory portions of the grand jury transcripts. See *Brady* v. *Maryland*, 373 U. S. 83 (1963). Upon reviewing this material, Williams demanded that the District Court dismiss the indictment, alleging that the Government had failed to fulfill its obligation under the Tenth Circuit's prior decision in *United States* v. *Page*, 808 F. 2d 723, 728 (1987), to present "substantial exculpatory evidence" to the grand jury (emphasis omitted). His contention was that evidence which the Government had chosen not to present to the grand jury—in particular, Williams' general ledgers and tax returns, and Williams' testimony in his contemporaneous Chapter 11 bankruptcy proceeding—disclosed that, for tax purposes and otherwise, he had regularly accounted for the "notes receivable" (and the interest on them) in a manner consistent with the Balance Sheet and the Income Statement. This, he contended, belied an intent to mislead the banks, and thus directly negated an essential element of the charged offense.

The District Court initially denied Williams' motion, but upon reconsideration ordered the indictment dismissed without prejudice. It found, after a hearing, that the withheld evidence was "relevant to an essential element of the crime charged," created " 'a reasonable doubt about [respondent's] guilt,' " App. to Pet. for Cert. 23a–24a (quoting *United States* v. *Gray*, 502 F. Supp. 150, 152 (DC 1980)), and thus "render[ed] the grand jury's decision to indict gravely suspect," App. to Pet. for Cert. 26a. Upon the Government's appeal, the Court of Appeals affirmed the District Court's order, following its earlier decision in *Page, supra*. It first sustained as not "clearly erroneous" the District Court's determination that the Government had withheld "substantial exculpatory evidence" from the grand jury. See 899 F. 2d 898, 900–903 (CA10 1990). It then found that the Government's behavior " 'substantially influence[d]' " the grand jury's decision to indict, or at the very least raised a " 'grave doubt that the

decision to indict was free from such substantial influence.'" *Id.*, at 903 (quoting *Bank of Nova Scotia* v. *United States*, 487 U. S. 250, 263 (1988)); see 899 F. 2d, at 903–904. Under these circumstances, the Tenth Circuit concluded, it was not an abuse of discretion for the District Court to require the Government to begin anew before the grand jury.[1] We granted certiorari. 502 U. S. 905 (1991).

## II

Before proceeding to the merits of this matter, it is necessary to discuss the propriety of reaching them. Certiorari was sought and granted in this case on the following question: "Whether an indictment may be dismissed because the government failed to present exculpatory evidence to the grand jury." The first point discussed in respondent's brief opposing the petition was captioned "The 'Question Presented' in the Petition Was Never Raised Below." Brief in Opposition 3. In granting certiorari, we necessarily considered and rejected that contention as a basis for denying review.

JUSTICE STEVENS' dissent, however, revisits that issue, and proposes that—after briefing, argument, and full consideration of the issue by all the Justices of this Court—we now decline to entertain this petition for the same reason we originally rejected, and that we dismiss it as improvidently granted. That would be improvident indeed. Our grant of certiorari was entirely in accord with our traditional practice, though even if it were not it would be imprudent (since there is no doubt that we have jurisdiction to entertain the case) to reverse course at this late stage. See, *e. g., Ferguson* v. *Moore-McCormack Lines, Inc.,* 352 U. S. 521, 560 (1957) (Harlan, J., concurring in part and dissenting in part); *Donnelly* v. *DeChristoforo,* 416 U. S. 637, 648 (1974) (Stew-

---

[1] The Tenth Circuit also rejected Williams' cross-appeal, which contended that the District Court's dismissal should have been with prejudice. See 899 F. 2d, at 904.

art, J., concurring, joined by WHITE, J.). Cf. *Oklahoma City v. Tuttle,* 471 U. S. 808, 816 (1985).

Our traditional rule, as the dissent correctly notes, precludes a grant of certiorari only when "the question presented was not pressed or passed upon below." *Post,* at 58 (internal quotation marks omitted). That this rule operates (as it is phrased) in the disjunctive, permitting review of an issue not pressed so long as it has been passed upon, is illustrated by some of our more recent dispositions. As recently as last Term, in fact (in an opinion joined by JUSTICE STEVENS), we entertained review in circumstances far more suggestive of the petitioner's "sleeping on its rights" than those we face today. We responded as follows to the argument of the Solicitor General that tracks today's dissent:

> "The Solicitor General . . . submits that the petition for certiorari should be dismissed as having been improvidently granted. He rests this submission on the argument that petitioner did not properly present the merits of the timeliness issue to the Court of Appeals, and that this Court should not address that question for the first time. He made the same argument in his opposition to the petition for certiorari. We rejected that argument in granting certiorari and we reject it again now because the Court of Appeals, like the District Court before it, decided the substantive issue presented." *Stevens* v. *Department of Treasury,* 500 U. S. 1, 8 (1991) (BLACKMUN, J.) (citations omitted).

And in another case decided last Term, we said the following:

> "Respondents argue that this issue was not raised below. The appeals court, however, addressed the availability of a right of action to minority shareholders in respondents' circumstances and concluded that respondents were entitled to sue. It suffices for our purposes that the court below passed on the issue presented, particularly where the issue is, we believe, in a

state of evolving definition and uncertainty, and one of importance to the administration of federal law." *Virginia Bankshares, Inc.* v. *Sandberg,* 501 U. S. 1083, 1099, n. 8 (1991) (citations omitted; internal quotation marks omitted).

(JUSTICE STEVENS' separate concurrence and dissent in *Virginia Bankshares* also reached the merits. *Id.,* at 1110–1112.)[2] As JUSTICE O'CONNOR has written:

"The standard we previously have employed is that we will not review a question not pressed *or* passed on by the courts below. Here, the Court of Appeals expressly ruled on the question, in an appropriate exercise of its

---

[2] The dissent purports to distinguish *Stevens* and *Virginia Bankshares* on the ground that, "[a]lthough the parties may not have raised the questions presented in the petitions . . . before the Courts of Appeals in those cases, the courts treated the questions as open questions that they needed to resolve in order to decide the cases." *Post,* at 58, n. 4. The significance of this distinction completely eludes us. While there is much to be said for a rule (to which the Court has never adhered) limiting review to questions pressed by the litigants below, the rule implicitly proposed by the dissent—under which issues not pressed, but nevertheless passed upon, may be reviewed only if the court below thought the issue an "open" one—makes no sense except as a device to distinguish *Stevens* and *Virginia Bankshares.* It does nothing to further "the adversary process" that is the object of the dissent's concern, *post,* at 59, n. 5; if a question is not disputed by the parties, "the adversary process" is compromised whether the court thinks the question open or not. Indeed, if anything, it is compromised *more* when the lower court believes it is confronting a question of first impression, for it is in those circumstances that the need for an adversary presentation is most acute.

The dissent observes that where a court disposes of a case on the basis of a "new rule that had not been debated by the parties, our review may be appropriate to give the losing party an opportunity it would not otherwise have to challenge the rule." *Ibid.* That is true enough, but the suggestion that this principle has something to do with *Stevens* and *Virginia Bankshares* is wholly unfounded: In neither case could—or did—the losing party claim to have been ambushed by the lower court's summary treatment of the undisputed issues which we later subjected to plenary review.

appellate jurisdiction; it is therefore entirely proper in light of our precedents for the Court to reach the question on which it granted certiorari . . . ." *Springfield* v. *Kibbe*, 480 U. S. 257, 266 (1987) (dissenting opinion) (emphasis in original; citations omitted).[3]

There is no doubt in the present case that the Tenth Circuit decided the crucial issue of the prosecutor's duty to present exculpatory evidence.[4] Moreover, this is not, as the dissent paints it, a case in which, "[a]fter losing in the Court of Appeals, the Government reversed its position," *post*, at 57.

---

[3] The Court's *per curiam* dismissal of the writ in *Kibbe* was based principally upon two considerations: (1) that the crucial issue was not raised in the District Court because of failure to object to a jury instruction, thus invoking Rule 51 of the Federal Rules of Civil Procedure, which provides that "[n]o party may assign as error the giving . . . [of] an instruction unless he objects thereto before the jury retires to consider its verdict," and (2) that the crucial issue had in addition not explicitly been raised in the petition for certiorari. 480 U. S., at 259, 260. Of course, neither circumstance exists here.

[4] Relying upon, and to some extent repeating, the reasoning of its earlier holding in *United States* v. *Page*, 808 F. 2d 723 (1981), the Court of Appeals said the following:

"We have previously held that a prosecutor has the duty to present substantial exculpatory evidence to the grand jury. Although we do not require the prosecutor to 'ferret out and present every bit of potentially exculpatory evidence,' we do require that substantial exculpatory evidence discovered during the course of an investigation be revealed to the grand jury. Other courts have also recognized that such a duty exists. This requirement promotes judicial economy because 'if a fully informed grand jury cannot find probable cause to indict, there is little chance the prosecution could have proved guilt beyond a reasonable doubt to a fully informed petit jury.'" 899 F. 2d 898, 900 (1990) (citations omitted).

This excerpt from the opinion below should make abundantly clear that, contrary to the dissent's mystifying assertion, see *post*, at 58, and n. 3, we premise our grant of certiorari not upon the Tenth Circuit's having "passed on" the issue in its prior *Page* decision, but rather upon its having done so in this case. We discuss *Page* only to point out that, had the Government *not* disputed the creation of the binding Tenth Circuit precedent in that case, a different exercise of discretion might be appropriate.

The dissent describes the Government as having "expressly acknowledged [in the Court of Appeals] *the responsibilities described in Page," post,* at 56 (emphasis added). It did no such thing. Rather, the Government acknowledged *"that it has certain responsibilities under . . . Page."* Brief for United States in Response to Appellee's Brief in Nos. 88–2827, 88–2843 (CA10), p. 9 (emphasis added). It conceded, in other words, not that the responsibilities *Page* had imposed were proper, but merely that *Page* had imposed them—over the protests of the Government, but in a judgment that was nonetheless binding precedent for the panel below. The dissent would apparently impose, as an absolute condition to our granting certiorari upon an issue decided by a lower court, that a party demand overruling of a squarely applicable, recent circuit precedent, even though that precedent was established in a case to which the party itself was privy and over the party's vigorous objection, see *Page,* 808 F. 2d, at 727 ("The government counters that a prosecutor has no duty to disclose exculpatory evidence [to a grand jury]"), and even though no "intervening developments in the law," *post,* at 59, n. 5, had occurred. That seems to us unreasonable.

In short, having reconsidered the precise question we resolved when this petition for review was granted, we again answer it the same way. It is a permissible exercise of our discretion to undertake review of an important issue expressly decided by a federal court [5] where, although the peti-

---

[5] Where certiorari is sought to a state court, "due regard for the appropriate relationship of this Court to state courts," *McGoldrick* v. *Compagnie Generale Transatlantique,* 309 U. S. 430, 434–435 (1940), may suggest greater restraint in applying our "pressed or passed upon" rule. In that context, the absence of challenge to a seemingly settled federal rule deprives the state court of an opportunity to rest its decision on an adequate and independent state ground. See *Illinois* v. *Gates,* 462 U. S. 213, 222 (1983), cited by the dissent *post,* at 59; see also *Bankers Life & Casualty Co.* v. *Crenshaw,* 486 U. S. 71, 79–80 (1988). But cf. *Cohen* v. *Cowles Media Co.,* 501 U. S. 663, 667 (1991) ("It is irrelevant to this Court's juris-

tioner did not contest the issue in the case immediately at hand, it did so as a party to the recent proceeding upon which the lower courts relied for their resolution of the issue, and did not concede in the current case the correctness of that precedent. Undoubtedly the United States benefits from this rule more often than other parties; but that is inevitably true of most desirable rules of procedure or jurisdiction that we announce, the United States being the most frequent litigant in our courts. Since we announce the rule to be applicable to all parties; since we have recently applied a similar rule (indeed, a rule even more broadly cast) to the *disadvantage* of the United States, see *Stevens* v. *Department of Treasury*, 500 U. S. 1 (1991); and since the dissenters themselves have approved the application of this rule (or a broader one) in circumstances rationally indistinguishable from those before us, see n. 2, *supra*; the dissent's suggestion that in deciding this case "the Court appears to favor the Government over the ordinary litigant," *post*, at 59, and compromises its "obligation to administer justice impartially," *ibid.*, needs no response.

### III

Respondent does not contend that the Fifth Amendment itself obliges the prosecutor to disclose substantial exculpatory evidence in his possession to the grand jury. Instead, building on our statement that the federal courts "may, within limits, formulate procedural rules not specifically required by the Constitution or the Congress," *United States* v. *Hasting*, 461 U. S. 499, 505 (1983), he argues that imposition of the Tenth Circuit's disclosure rule is supported by the courts' "supervisory power." We think not. *Hasting*, and the cases that rely upon the principle it expresses, deal strictly with the courts' power to control their *own* procedures. See, *e. g., Jencks* v. *United States*, 353 U. S. 657, 667–

diction whether a party raised below and argued a federal-law issue that the state supreme court actually considered and decided").

668 (1957); *McNabb* v. *United States,* 318 U. S. 332 (1943). That power has been applied not only to improve the truth-finding process of the trial, see, *e. g., Mesarosh* v. *United States,* 352 U. S. 1, 9–14 (1956), but also to prevent parties from reaping benefit or incurring harm from violations of substantive or procedural rules (imposed by the Constitution or laws) governing matters apart from the trial itself, see, *e. g., Weeks* v. *United States,* 232 U. S. 383 (1914). Thus, *Bank of Nova Scotia* v. *United States,* 487 U. S. 250 (1988), makes clear that the supervisory power can be used to dismiss an indictment because of misconduct before the grand jury, at least where that misconduct amounts to a violation of one of those "few, clear rules which were carefully drafted and approved by this Court and by Congress to ensure the integrity of the grand jury's functions," *United States* v. *Mechanik,* 475 U. S. 66, 74 (1986) (O'CONNOR, J., concurring in judgment).[6]

We did not hold in *Bank of Nova Scotia,* however, that the courts' supervisory power could be used, not merely as a means of enforcing or vindicating legally compelled stand-

---

[6] Rule 6 of the Federal Rules of Criminal Procedure contains a number of such rules, providing, for example, that "no person other than the jurors may be present while the grand jury is deliberating or voting," Rule 6(d), and placing strict controls on disclosure of "matters occurring before the grand jury," Rule 6(e); see generally *United States* v. *Sells Engineering, Inc.,* 463 U. S. 418 (1983). Additional standards of behavior for prosecutors (and others) are set forth in the United States Code. See 18 U. S. C. §§ 6002, 6003 (setting forth procedures for granting a witness immunity from prosecution); § 1623 (criminalizing false declarations before grand jury); § 2515 (prohibiting grand jury use of unlawfully intercepted wire or oral communications); § 1622 (criminalizing subornation of perjury). That some of the misconduct alleged in *Bank of Nova Scotia* v. *United States,* 487 U. S. 250 (1988), was not specifically proscribed by Rule, statute, or the Constitution does not make the case stand for a judicially prescribable grand jury code, as the dissent suggests, see *post,* at 64–65. All of the allegations of violation were dismissed by the Court—without considering their validity in law—for failure to meet *Nova Scotia*'s dismissal standard. See *Bank of Nova Scotia, supra,* at 261.

ards of prosecutorial conduct before the grand jury, but as a means of *prescribing* those standards of prosecutorial conduct in the first instance—just as it may be used as a means of establishing standards of prosecutorial conduct before the courts themselves. It is this latter exercise that respondent demands. Because the grand jury is an institution separate from the courts, over whose functioning the courts do not preside, we think it clear that, as a general matter at least, no such "supervisory" judicial authority exists, and that the disclosure rule applied here exceeded the Tenth Circuit's authority.

## A

"[R]ooted in long centuries of Anglo-American history," *Hannah* v. *Larche,* 363 U. S. 420, 490 (1960) (Frankfurter, J., concurring in result), the grand jury is mentioned in the Bill of Rights, but not in the body of the Constitution. It has not been textually assigned, therefore, to any of the branches described in the first three Articles. It " 'is a constitutional fixture in its own right.' " *United States* v. *Chanen,* 549 F. 2d 1306, 1312 (CA9) (quoting *Nixon* v. *Sirica,* 159 U. S. App. D. C. 58, 70, n. 54, 487 F. 2d 700, 712, n. 54 (1973)), cert. denied, 434 U. S. 825 (1977). In fact the whole theory of its function is that it belongs to no branch of the institutional Government, serving as a kind of buffer or referee between the Government and the people. See *Stirone* v. *United States,* 361 U. S. 212, 218 (1960); *Hale* v. *Henkel,* 201 U. S. 43, 61 (1906); G. Edwards, The Grand Jury 28–32 (1906). Although the grand jury normally operates, of course, in the courthouse and under judicial auspices, its institutional relationship with the Judicial Branch has traditionally been, so to speak, at arm's length. Judges' direct involvement in the functioning of the grand jury has generally been confined to the constitutive one of calling the grand jurors together and administering their oaths of office. See *United States* v. *Calandra,* 414 U. S. 338, 343 (1974); Fed. Rule Crim. Proc. 6(a).

The grand jury's functional independence from the Judicial Branch is evident both in the scope of its power to investigate criminal wrongdoing and in the manner in which that power is exercised. "Unlike [a] [c]ourt, whose jurisdiction is predicated upon a specific case or controversy, the grand jury 'can investigate merely on suspicion that the law is being violated, or even because it wants assurance that it is not.'" *United States* v. *R. Enterprises, Inc.*, 498 U. S. 292, 297 (1991) (quoting *United States* v. *Morton Salt Co.*, 338 U. S. 632, 642–643 (1950)). It need not identify the offender it suspects, or even "the precise nature of the offense" it is investigating. *Blair* v. *United States*, 250 U. S. 273, 282 (1919). The grand jury requires no authorization from its constituting court to initiate an investigation, see *Hale, supra,* at 59–60, 65, nor does the prosecutor require leave of court to seek a grand jury indictment. And in its day-to-day functioning, the grand jury generally operates without the interference of a presiding judge. See *Calandra, supra,* at 343. It swears in its own witnesses, Fed. Rule Crim. Proc. 6(c), and deliberates in total secrecy, see *United States* v. *Sells Engineering, Inc.*, 463 U. S. 418, 424–425 (1983).

True, the grand jury cannot compel the appearance of witnesses and the production of evidence, and must appeal to the court when such compulsion is required. See, *e. g., Brown* v. *United States*, 359 U. S. 41, 49 (1959). And the court will refuse to lend its assistance when the compulsion the grand jury seeks would override rights accorded by the Constitution, see, *e. g., Gravel* v. *United States*, 408 U. S. 606 (1972) (grand jury subpoena effectively qualified by order limiting questioning so as to preserve Speech or Debate Clause immunity), or even testimonial privileges recognized by the common law, see *In re Grand Jury Investigation of Hugle*, 754 F. 2d 863 (CA9 1985) (opinion of Kennedy, J.) (same with respect to privilege for confidential marital communications). Even in this setting, however, we have insisted that the grand jury remain "free to pursue its investi-

gations unhindered by external influence or supervision so long as it does not trench upon the legitimate rights of any witness called before it." *United States* v. *Dionisio,* 410 U. S. 1, 17–18 (1973). Recognizing this tradition of independence, we have said that the Fifth Amendment's "constitutional guarantee *presupposes* an investigative body 'acting independently of either prosecuting attorney *or judge'. . . ."* *Id.,* at 16 (emphasis added) (quoting *Stirone, supra,* at 218).

No doubt in view of the grand jury proceeding's status as other than a constituent element of a "criminal prosecutio[n]," U. S. Const., Amdt. 6, we have said that certain constitutional protections afforded defendants in criminal proceedings have no application before that body. The Double Jeopardy Clause of the Fifth Amendment does not bar a grand jury from returning an indictment when a prior grand jury has refused to do so. See *Ex parte United States,* 287 U. S. 241, 250–251 (1932); *United States* v. *Thompson,* 251 U. S. 407, 413–415 (1920). We have twice suggested, though not held, that the Sixth Amendment right to counsel does not attach when an individual is summoned to appear before a grand jury, even if he is the subject of the investigation. See *United States* v. *Mandujano,* 425 U. S. 564, 581 (1976) (plurality opinion); *In re Groban,* 352 U. S. 330, 333 (1957); see also Fed. Rule Crim. Proc. 6(d). And although "the grand jury may not force a witness to answer questions in violation of [the Fifth Amendment's] constitutional guarantee" against self-incrimination, *Calandra, supra,* at 346 (citing *Kastigar* v. *United States,* 406 U. S. 441 (1972)), our cases suggest that an indictment obtained through the use of evidence previously obtained in violation of the privilege against self-incrimination "is nevertheless valid." *Calandra, supra,* at 346; see *Lawn* v. *United States,* 355 U. S. 339, 348–350 (1958); *United States* v. *Blue,* 384 U. S. 251, 255, n. 3 (1966).

Given the grand jury's operational separateness from its constituting court, it should come as no surprise that we

have been reluctant to invoke the judicial supervisory power as a basis for prescribing modes of grand jury procedure. Over the years, we have received many requests to exercise supervision over the grand jury's evidence-taking process, but we have refused them all, including some more appealing than the one presented today. In *United States* v. *Calandra, supra,* a grand jury witness faced questions that were allegedly based upon physical evidence the Government had obtained through a violation of the Fourth Amendment; we rejected the proposal that the exclusionary rule be extended to grand jury proceedings, because of "the potential injury to the historic role and functions of the grand jury." 414 U. S., at 349. In *Costello* v. *United States,* 350 U. S. 359 (1956), we declined to enforce the hearsay rule in grand jury proceedings, since that "would run counter to the whole history of the grand jury institution, in which laymen conduct their inquiries unfettered by technical rules." *Id.,* at 364.

These authorities suggest that any power federal courts may have to fashion, on their own initiative, rules of grand jury procedure is a very limited one, not remotely comparable to the power they maintain over their own proceedings. See *United States* v. *Chanen,* 549 F. 2d, at 1313. It certainly would not permit judicial reshaping of the grand jury institution, substantially altering the traditional relationships between the prosecutor, the constituting court, and the grand jury itself. Cf., *e. g., United States* v. *Payner,* 447 U. S. 727, 736 (1980) (supervisory power may not be applied to permit defendant to invoke third party's Fourth Amendment rights); see generally Beale, Reconsidering Supervisory Power in Criminal Cases: Constitutional and Statutory Limits on the Authority of the Federal Courts, 84 Colum. L. Rev. 1433, 1490–1494, 1522 (1984). As we proceed to discuss, that would be the consequence of the proposed rule here.

 

## B

Respondent argues that the Court of Appeals' rule can be justified as a sort of Fifth Amendment "common law," a necessary means of assuring the constitutional right to the judgment "of an independent and informed grand jury," *Wood* v. *Georgia*, 370 U. S. 375, 390 (1962). Brief for Respondent 27. Respondent makes a generalized appeal to functional notions: Judicial supervision of the quantity and quality of the evidence relied upon by the grand jury plainly facilitates, he says, the grand jury's performance of its twin historical responsibilities, *i. e.*, bringing to trial those who may be justly accused and shielding the innocent from unfounded accusation and prosecution. See, *e. g., Stirone* v. *United States*, 361 U. S., at 218, n. 3. We do not agree. The rule would neither preserve nor enhance the traditional functioning of the institution that the Fifth Amendment demands. To the contrary, requiring the prosecutor to present exculpatory as well as inculpatory evidence would alter the grand jury's historical role, transforming it from an accusatory to an adjudicatory body.

It is axiomatic that the grand jury sits not to determine guilt or innocence, but to assess whether there is adequate basis for bringing a criminal charge. See *United States* v. *Calandra*, 414 U. S., at 343. That has always been so; and to make the assessment it has always been thought sufficient to hear only the prosecutor's side. As Blackstone described the prevailing practice in 18th-century England, the grand jury was "only to hear evidence on behalf of the prosecution[,] for the finding of an indictment is only in the nature of an enquiry or accusation, which is afterwards to be tried and determined." 4 W. Blackstone, Commentaries 300 (1769); see also 2 M. Hale, Pleas of the Crown 157 (1st Am. ed. 1847). So also in the United States. According to the description of an early American court, three years before the Fifth Amendment was ratified, it is the grand jury's function not "to enquire . . . upon what foundation [the charge

may be] denied," or otherwise to try the suspect's defenses, but only to examine "upon what foundation [the charge] is made" by the prosecutor. *Respublica* v. *Shaffer*, 1 Dall. 236 (O. T. Phila. 1788); see also F. Wharton, Criminal Pleading and Practice § 360, pp. 248–249 (8th ed. 1880). As a consequence, neither in this country nor in England has the suspect under investigation by the grand jury ever been thought to have a right to testify or to have exculpatory evidence presented. See 2 Hale, *supra*, at 157; *United States ex rel. McCann* v. *Thompson*, 144 F. 2d 604, 605–606 (CA2), cert. denied, 323 U. S. 790 (1944).

Imposing upon the prosecutor a legal obligation to present exculpatory evidence in his possession would be incompatible with this system. If a "balanced" assessment of the entire matter is the objective, surely the first thing to be done— rather than requiring the prosecutor to say what he knows in defense of the target of the investigation—is to entitle the target to tender his own defense. To require the former while denying (as we do) the latter would be quite absurd. It would also be quite pointless, since it would merely invite the target to circumnavigate the system by delivering his exculpatory evidence to the prosecutor, whereupon it would *have* to be passed on to the grand jury—unless the prosecutor is willing to take the chance that a court will not deem the evidence important enough to qualify for mandatory disclosure.[7] See, *e. g., United States* v. *Law Firm of Zimmerman & Schwartz, P. C.*, 738 F. Supp. 407, 411 (Colo. 1990) (duty to disclose exculpatory evidence held satisfied when

---

[7] How much of a gamble that is is illustrated by the Court of Appeals' opinion in the present case. Though the court purported to be applying the "substantial exculpatory" standard set forth in its prior *Page* decision, see 899 F. 2d, at 900, portions of the opinion recite a much more inclusive standard. See *id.*, at 902 ("[T]he grand jury must receive any information that is relevant to any reasonable [exculpatory] theory it may adopt"); *ibid.* ("We conclude, therefore, that the district court was not clearly in error when it found that the deposition testimony was exculpatory").

prosecution tendered to the grand jury defense-provided exhibits, testimony, and explanations of the governing law), aff'd *sub nom. United States* v. *Brown,* 943 F. 2d 1246, 1257 (CA10 1991).

Respondent acknowledges (as he must) that the "common law" of the grand jury is not violated if the *grand jury itself* chooses to hear no more evidence than that which suffices to convince it an indictment is proper. Cf. *Thompson, supra,* at 607. Thus, had the Government offered to familiarize the grand jury in this case with the five boxes of financial statements and deposition testimony alleged to contain exculpatory information, and had the grand jury rejected the offer as pointless, respondent would presumably agree that the resulting indictment would have been valid. Respondent insists, however, that courts must require the modern prosecutor to alert the grand jury to the nature and extent of the available exculpatory evidence, because otherwise the grand jury "merely functions as an arm of the prosecution." Brief for Respondent 27. We reject the attempt to convert a nonexistent duty of the grand jury itself into an obligation of the prosecutor. The authority of the prosecutor to seek an indictment has long been understood to be "coterminous with the authority of the grand jury to entertain [the prosecutor's] charges." *United States* v. *Thompson,* 251 U. S., at 414. If the grand jury has no obligation to consider all "substantial exculpatory" evidence, we do not understand how the prosecutor can be said to have a binding obligation to present it.

There is yet another respect in which respondent's proposal not only fails to comport with, but positively contradicts, the "common law" of the Fifth Amendment grand jury. Motions to quash indictments based upon the sufficiency of the evidence relied upon by the grand jury were unheard of at common law in England, see, *e. g., People* v. *Restenblatt,* 1 Abb. Pr. 268, 269 (Ct. Gen. Sess. N. Y. 1855). And the traditional American practice was described by Justice Nelson, riding circuit in 1852, as follows:

"No case has been cited, nor have we been able to find any, furnishing an authority for looking into and revising the judgment of the grand jury upon the evidence, for the purpose of determining whether or not the finding was founded upon sufficient proof, or whether there was a deficiency in respect to any part of the complaint . . . ." *United States* v. *Reed,* 27 F. Cas. 727, 738 (No. 16,134) (CC NDNY 1852).

We accepted Justice Nelson's description in *Costello* v. *United States,* where we held that "[i]t would run counter to the whole history of the grand jury institution" to permit an indictment to be challenged "on the ground that there was inadequate or incompetent evidence before the grand jury." 350 U. S., at 363–364. And we reaffirmed this principle recently in *Bank of Nova Scotia,* where we held that "the mere fact that evidence itself is unreliable is not sufficient to require a dismissal of the indictment," and that "a challenge to the reliability or competence of the evidence presented to the grand jury" will not be heard. 487 U. S., at 261. It would make little sense, we think, to abstain from reviewing the evidentiary support for the grand jury's judgment while scrutinizing the sufficiency of the prosecutor's presentation. A complaint about the quality or adequacy of the evidence can always be recast as a complaint that the prosecutor's presentation was "incomplete" or "misleading."[8] Our words in *Costello* bear repeating: Review of facially

---

[8] In *Costello,* for example, instead of complaining about the grand jury's *reliance* upon hearsay evidence the petitioner could have complained about the prosecutor's *introduction* of it. See, *e. g., United States* v. *Estepa,* 471 F. 2d 1132, 1136–1137 (CA2 1972) (prosecutor should not introduce hearsay evidence before grand jury when direct evidence is available); see also Arenella, Reforming the Federal Grand Jury and the State Preliminary Hearing to Prevent Conviction Without Adjudication, 78 Mich. L. Rev. 463, 540 (1980) ("[S]ome federal courts have cautiously begun to . . . us[e] a revitalized prosecutorial misconduct doctrine to circumvent *Costello*'s prohibition against directly evaluating the sufficiency of the evidence presented to the grand jury").

valid indictments on such grounds "would run counter to the whole history of the grand jury institution[,] [and] [n]either justice nor the concept of a fair trial requires [it]."  350 U. S., at 364.

*    *    *

Echoing the reasoning of the Tenth Circuit in *United States* v. *Page,* 808 F. 2d, at 728, respondent argues that a rule requiring the prosecutor to disclose exculpatory evidence to the grand jury would, by removing from the docket unjustified prosecutions, save valuable judicial time.  That depends, we suppose, upon what the ratio would turn out to be between unjustified prosecutions eliminated and grand jury indictments challenged—for the latter as well as the former consume "valuable judicial time."  We need not pursue the matter; if there is an advantage to the proposal, Congress is free to prescribe it.  For the reasons set forth above, however, we conclude that courts have no authority to prescribe such a duty pursuant to their inherent supervisory authority over their own proceedings.  The judgment of the Court of Appeals is accordingly reversed, and the cause is remanded for further proceedings consistent with this opinion.

*So ordered.*

JUSTICE STEVENS, with whom JUSTICE BLACKMUN and JUSTICE O'CONNOR join, and with whom JUSTICE THOMAS joins as to Parts II and III, dissenting.

The Court's opinion announces two important changes in the law.  First, it justifies its special accommodation to the Solicitor General in granting certiorari to review a contention that was not advanced in either the District Court or the Court of Appeals by explaining that the fact that the issue was raised in a different case is an adequate substitute for raising it in *this* case.  Second, it concludes that a federal court has no power to enforce the prosecutor's obligation to

protect the fundamental fairness of proceedings before the grand jury.

I

The question presented by the certiorari petition is whether the failure to disclose substantial exculpatory evidence to the grand jury is a species of prosecutorial misconduct that may be remedied by dismissing an indictment without prejudice. In the District Court and the Court of Appeals both parties agreed that the answer to that question is "yes, in an appropriate case." The only disagreement was whether this was an appropriate case: The prosecutor vigorously argued that it was not because the undisclosed evidence was not substantial exculpatory evidence, while respondent countered that the evidence was exculpatory and the prosecutor's misconduct warranted a dismissal with prejudice.

In an earlier case arising in the Tenth Circuit, *United States* v. *Page*, 808 F. 2d 723, cert. denied, 482 U. S. 918 (1987), the defendant had claimed that his indictment should have been dismissed because the prosecutor was guilty of misconduct during the grand jury proceedings. Specifically, he claimed that the prosecutor had allowed the grand jury to consider false testimony and had failed to present it with substantial exculpatory evidence. 808 F. 2d, at 726–727. After noting that there are "two views concerning the duty of a prosecutor to present exculpatory evidence to a grand jury," *id.*, at 727, the court concluded that the "better, and more balanced rule" is that "when *substantial* exculpatory evidence is discovered in the course of an investigation, it must be revealed to the grand jury," *id.*, at 728 (emphasis in original). The court declined to dismiss the indictment, however, because the evidence withheld in that case was not "clearly exculpatory." *Ibid.*

In this case the Government expressly acknowledged the responsibilities described in *Page*, but argued that the with-

held evidence was not exculpatory or significant.[1] Instead of questioning the controlling rule of law, it distinguished the facts of this case from those of an earlier case in which an indictment had been dismissed because the prosecutor had withheld testimony that made it factually impossible for the corporate defendant to have been guilty.[2] The Government concluded its principal brief with a request that the court apply the test set forth in *Bank of Nova Scotia* v. *United States*, 487 U. S. 250 (1988), "follow the holding of *Page*," and hold that dismissal was not warranted in this case because the withheld evidence was not substantial exculpatory evidence and respondent "was not prejudiced in any way." Brief for United States in No. 88–2827 (CA10), pp. 40–43.

After losing in the Court of Appeals, the Government reversed its position and asked this Court to grant certiorari

---

[1] "The government has acknowledged that it has certain responsibilities under the case of *United States* v. *Page*, 808 F. 2d 723 (10th Cir. 1987), and that includes a duty to not withhold substantial exculpatory evidence from a grand jury if such exists. . . . The government would contend that . . . it was familiar with and complied with the principles stated in the case. . . . Considering the evidence as a whole, it is clear that the government complied with, and went beyond the requirements of *Page, supra*." Brief for United States in Response to Appellee's Brief in Nos. 88–2827, 88–2843 (CA10), pp. 9–10.

[2] Respondent had relied on *United States* v. *Phillips Petroleum Co.*, 435 F. Supp. 610 (ND Okla. 1977). The Government distinguished the case based on "the type of evidence excluded. In *Phillips, supra*, the prosecutor sent the Grand Jury home for the day, but continued questioning a witness. In that session, outside the hearing of the Grand Jury members, the witness, who had been granted use immunity, testified to certain information which showed that the witness had been the one who knowingly committed an offense, and showed that the corporation had not intentionally committed an offense in that case. There was no question that the withheld testimony made it factually impossible for the corporate defendant to have been guilty, and therefore the evidence was substantial and exculpatory. In the instant case there is a disagreement between the government and the defendant as to whether the documents the defendant wants presented in full are exculpatory." Brief for United States in No. 88–2827 (CA10), p. 38.

and to hold that the prosecutor has no judicially enforceable duty to present exculpatory evidence to the grand jury. In his brief in opposition to the petition, respondent clearly pointed out that the question presented by the petition "was neither presented to nor addressed by the courts below." Brief in Opposition 2. He appropriately called our attention to many of the cases in which we have stated, repeated, and reiterated the general rule that precludes a grant of certiorari when the question presented was "not pressed or passed upon below."[3] *Id.*, at 5–9. Apart from the fact that the United States is the petitioner, I see no reason for not following that salutary practice in this case.[4] Nevertheless, the requisite number of Justices saw fit to grant the Solicitor General's petition. 502 U. S. 905 (1991).

The Court explains that the settled rule does not apply to the Government's certiorari petition in this case because the Government raised the same question three years earlier in the *Page* case and the Court of Appeals passed on the issue in that case. *Ante*, at 44–45. This is a novel, and unwise,

[3] *Duignan* v. *United States*, 274 U. S. 195, 200 (1927); see also, *e. g.*, *United States* v. *Lovasco*, 431 U. S. 783, 788, n. 7 (1977); *United States* v. *Ortiz*, 422 U. S. 891, 898 (1975). Until today the Court has never suggested that the fact that an argument was pressed by the litigant or passed on by the court of appeals in a different case would satisfy this requirement.

[4] *Stevens* v. *Department of Treasury*, 500 U. S. 1 (1991), and *Virginia Bankshares, Inc.* v. *Sandberg*, 501 U. S. 1083 (1991), discussed by the Court, *ante*, at 41–42, were routine applications of the settled rule. Although the parties may not have raised the questions presented in the petitions for certiorari before the Courts of Appeals in those cases, the courts treated the questions as open questions that they needed to resolve in order to decide the cases. Similarly, in *Springfield* v. *Kibbe*, 480 U. S. 257 (1987), the Court of Appeals had expressly considered and answered the question that JUSTICE O'CONNOR thought we should decide, see *id.*, at 263–266. This case, in contrast, involved "the routine restatement and application of settled law by an appellate court," which we have previously found insufficient to satisfy the "pressed or passed upon below" rule. *Illinois* v. *Gates*, 462 U. S. 213, 222–223 (1983).

change in the rule. We have never suggested that the fact that a court has repeated a settled proposition of law and applied it, without objection, in the case at hand provides a sufficient basis for our review.[5] See *Illinois* v. *Gates*, 462 U. S. 213, 222–223 (1983), and cases cited therein. If this is to be the rule in the future, it will either provide a basis for a significant expansion of our discretionary docket[6] or, if applied only to benefit repetitive litigants, a special privilege for the Federal Government.

This Court has a special obligation to administer justice impartially and to set an example of impartiality for other courts to emulate. When the Court appears to favor the Government over the ordinary litigant, it seriously compromises its ability to discharge that important duty. For that

---

[5] The Court expresses an inability to understand the difference between the routine application, without objection, of a settled rule, on the one hand, and the decision of an open question on a ground not argued by the parties, on the other. The difference is best explained in light of the basic assumption that the adversary process provides the best method of arriving at correct decisions. Rules of appellate practice generally require that an issue be actually raised and debated by the parties if it is to be preserved. In the exceptional case, in which an appellate court announces a new rule that had not been debated by the parties, our review may be appropriate to give the losing party an opportunity it would not otherwise have to challenge the rule. In this case, however, there is no reason why the Government could not have challenged the *Page* rule in this case in the Tenth Circuit. There is no need for an exception to preserve the losing litigant's opportunity to be heard. Moreover, the Government's failure to object to the application of the *Page* rule deprived the Court of Appeals of an opportunity to reexamine the validity of that rule in the light of intervening developments in the law. "Sandbagging" is just as improper in an appellate court as in a trial court.

[6] The "expressed or passed on" predicate for the exercise of our jurisdiction is of special importance in determining our power to review state-court judgments. If the Court's newly announced view that the routine application of a settled rule satisfies the "passed on" requirement in a federal case, I see no reason why it should not also satisfy the same requirement in a state case.

reason alone, I would dismiss the writ of certiorari as improvidently granted.[7]

## II

Like the Hydra slain by Hercules, prosecutorial misconduct has many heads. Some are cataloged in Justice Sutherland's classic opinion for the Court in *Berger* v. *United States,* 295 U. S. 78 (1935):

> "That the United States prosecuting attorney overstepped the bounds of that propriety and fairness which should characterize the conduct of such an officer in the prosecution of a criminal offense is clearly shown by the record. He was guilty of misstating the facts in his cross-examination of witnesses; of putting into the mouths of such witnesses things which they had not said; of suggesting by his questions that statements had been made to him personally out of court, in respect of which no proof was offered; of pretending to understand that a witness had said something which he had not said and persistently cross-examining the witness upon that basis; of assuming prejudicial facts not in evidence; of

---

[7] The Court suggests that it would be "improvident" for the Court to dismiss the writ of certiorari on the ground that the Government failed to raise the question presented in the lower courts because respondent raised this argument in his brief in opposition, the Court nevertheless granted the writ, and the case has been briefed and argued. *Ante,* at 40. I disagree. The vote of four Justices is sufficient to grant a petition for certiorari, but that action does not preclude a majority of the Court from dismissing the writ as improvidently granted after the case has been argued. See, *e. g., NAACP* v. *Overstreet,* 384 U. S. 118 (1966) (dismissing, after oral argument, writ as improvidently granted over the dissent of four Justices). We have frequently dismissed the writ as improvidently granted after the case has been briefed and argued; in fact, we have already done so twice this Term. See *Gibson* v. *Florida Bar,* 502 U. S. 104 (1991); *PFZ Properties, Inc.* v. *Rodriguez,* 503 U. S. 257 (1992). Although we do not always explain the reason for the dismissal, we have on occasion dismissed the writ for the reasons raised by the respondent in the brief in opposition. Thus, nothing precludes the Court from dismissing the writ in this case.

bullying and arguing with witnesses; and in general, of conducting himself in a thoroughly indecorous and improper manner. . . .

"The prosecuting attorney's argument to the jury was undignified and intemperate, containing improper insinuations and assertions calculated to mislead the jury." *Id.*, at 84–85.

This, of course, is not an exhaustive list of the kinds of improper tactics that overzealous or misguided prosecutors have adopted in judicial proceedings. The reported cases of this Court alone contain examples of the knowing use of perjured testimony, *Mooney* v. *Holohan*, 294 U. S. 103 (1935), the suppression of evidence favorable to an accused person, *Brady* v. *Maryland*, 373 U. S. 83, 87–88 (1963), and misstatements of the law in argument to the jury, *Caldwell* v. *Mississippi*, 472 U. S. 320, 336 (1985), to name just a few.

Nor has prosecutorial misconduct been limited to judicial proceedings: The reported cases indicate that it has sometimes infected grand jury proceedings as well. The cases contain examples of prosecutors presenting perjured testimony, *United States* v. *Basurto*, 497 F. 2d 781, 786 (CA9 1974), questioning a witness outside the presence of the grand jury and then failing to inform the grand jury that the testimony was exculpatory, *United States* v. *Phillips Petroleum, Inc.*, 435 F. Supp. 610, 615–617 (ND Okla. 1977), failing to inform the grand jury of its authority to subpoena witnesses, *United States* v. *Samango*, 607 F. 2d 877, 884 (CA9 1979), operating under a conflict of interest, *United States* v. *Gold*, 470 F. Supp. 1336, 1346–1351 (ND Ill. 1979), misstating the law, *United States* v. *Roberts*, 481 F. Supp. 1385, 1389, and n. 10 (CD Cal. 1980),[8] and misstating the facts on cross-

_____

[8] The court found the Government guilty of prosecutorial misconduct because it "fail[ed] to provide the polygraph evidence to the Grand Jury despite the prosecutor's guarantee to Judge Pregerson that all exculpatory evidence would be presented to the Grand Jury, and compound[ed] this indiscretion by erroneously but unequivocally telling the Grand Jury that

examination of a witness, *United States* v. *Lawson*, 502 F. Supp. 158, 162, and nn. 6–7 (Md. 1980).

Justice Sutherland's identification of the basic reason why that sort of misconduct is intolerable merits repetition:

> "The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Berger* v. *United States*, 295 U. S., at 88.

It is equally clear that the prosecutor has the same duty to refrain from improper methods calculated to produce a wrongful indictment. Indeed, the prosecutor's duty to protect the fundamental fairness of judicial proceedings assumes special importance when he is presenting evidence to a grand jury. As the Court of Appeals for the Third Circuit recognized, "the costs of continued unchecked prosecutorial misconduct" before the grand jury are particularly substantial because there

> "the prosecutor operates without the check of a judge or a trained legal adversary, and virtually immune from public scrutiny. The prosecutor's abuse of his special

---

the polygraph evidence was inadmissible." *United States* v. *Roberts*, 481 F. Supp., at 1389.

relationship to the grand jury poses an enormous risk to defendants as well. For while in theory a trial provides the defendant with a full opportunity to contest and disprove the charges against him, in practice, the handing up of an indictment will often have a devastating personal and professional impact that a later dismissal or acquittal can never undo. Where the potential for abuse is so great, and the consequences of a mistaken indictment so serious, the ethical responsibilities of the prosecutor, and the obligation of the judiciary to protect against even the appearance of unfairness, are correspondingly heightened." *United States* v. *Serubo*, 604 F. 2d 807, 817 (1979).

In his dissent in *United States* v. *Ciambrone*, 601 F. 2d 616 (CA2 1979), Judge Friendly also recognized the prosecutor's special role in grand jury proceedings:

"As the Supreme Court has noted, 'the Founders thought the grand jury so essential to basic liberties that they provided in the Fifth Amendment that federal prosecution for serious crimes can only be instituted by "a presentment or indictment of a Grand Jury."' *United States* v. *Calandra*, 414 U. S. 338, 343, . . . (1974). Before the grand jury the prosecutor has the dual role of pressing for an indictment and of being the grand jury adviser. In case of conflict, the latter duty must take precedence. *United States* v. *Remington*, 208 F. 2d 567, 573–74 (2d Cir. 1953) (L. Hand, J., dissenting), *cert. denied*, 347 U. S. 913 . . . (1954).

"The *ex parte* character of grand jury proceedings makes it peculiarly important for a federal prosecutor to remember that, in the familiar phrase, the interest of the United States 'in a criminal prosecution is not that it shall win a case, but that justice shall be done.'

*Berger* v. *United States*, 295 U. S. 78, 88 . . . (1935)." *Id.*, at 628–629.[9]

The standard for judging the consequences of prosecutorial misconduct during grand jury proceedings is essentially the same as the standard applicable to trials. In *United States* v. *Mechanik*, 475 U. S. 66 (1986), we held that there was "no reason not to apply [the harmless error rule] to 'errors, defects, irregularities, or variances' occurring before a grand jury just as we have applied it to such error occurring in the criminal trial itself," *id.*, at 71–72. We repeated that holding in *Bank of Nova Scotia* v. *United States*, 487 U. S. 250 (1988), when we rejected a defendant's argument that an indictment should be dismissed because of prosecutorial misconduct and irregularities in proceedings before the grand jury. Referring to the prosecutor's misconduct before the grand jury, we "concluded that our customary harmless-error inquiry is applicable where, as in the cases before us, a court is asked to dismiss an indictment prior to the conclusion of the trial." *Id.*, at 256. Moreover, in reviewing the instances of misconduct in that case, we applied precisely the

---

[9] Although the majority in *Ciambrone* did not agree with Judge Friendly's appraisal of the prejudicial impact of the misconduct in that case, it also recognized the prosecutor's duty to avoid fundamentally unfair tactics during the grand jury proceedings. Judge Mansfield explained:

"On the other hand, the prosecutor's right to exercise some discretion and selectivity in the presentation of evidence to a grand jury does not entitle him to mislead it or to engage in fundamentally unfair tactics before it. The prosecutor, for instance, may not obtain an indictment on the basis of evidence known to him to be perjurious, *United States* v. *Basurto*, 497 F. 2d 781, 785–86 (9th Cir. 1974), or by leading it to believe that it has received eyewitness rather than hearsay testimony, *United States* v. *Estepa*, 471 F. 2d 1132, 1136–37 (2d Cir. 1972). We would add that where a prosecutor is aware of any substantial evidence negating guilt he should, in the interest of justice, make it known to the grand jury, at least where it might reasonably be expected to lead the jury not to indict. See ABA Project on Standards for Criminal Justice—the Prosecution Function, § 3.6, pp. 90–91." 601 F. 2d, at 623.

same standard to the prosecutor's violations of Rule 6 of the Federal Rules of Criminal Procedure and to his violations of the general duty of fairness that applies to all judicial proceedings. This point is illustrated by the Court's comments on the prosecutor's abuse of a witness:

> "The District Court found that a prosecutor was abusive to an expert defense witness during a recess and in the hearing of some grand jurors. Although the Government concedes that the treatment of the expert tax witness was improper, the witness himself testified that his testimony was unaffected by this misconduct. The prosecutors instructed the grand jury to disregard anything they may have heard in conversations between a prosecutor and a witness, and explained to the grand jury that such conversations should have no influence on its deliberations. App. 191. In light of these ameliorative measures, there is nothing to indicate that the prosecutor's conduct toward this witness substantially affected the grand jury's evaluation of the testimony or its decision to indict." 487 U. S., at 261.

Unquestionably, the plain implication of that discussion is that if the misconduct, even though not expressly forbidden by any written rule, had played a critical role in persuading the jury to return the indictment, dismissal would have been required.

In an opinion that I find difficult to comprehend, the Court today repudiates the assumptions underlying these cases and seems to suggest that the court has no authority to supervise the conduct of the prosecutor in grand jury proceedings so long as he follows the dictates of the Constitution, applicable statutes, and Rule 6 of the Federal Rules of Criminal Procedure. The Court purports to support this conclusion by invoking the doctrine of separation of powers and citing a string of cases in which we have declined to impose categori-

cal restraints on the grand jury. Needless to say, the Court's reasoning is unpersuasive.

Although the grand jury has not been "textually assigned" to "any of the branches described in the first three Articles" of the Constitution, *ante,* at 47, it is not an autonomous body completely beyond the reach of the other branches. Throughout its life, from the moment it is convened until it is discharged, the grand jury is subject to the control of the court. As Judge Learned Hand recognized over 60 years ago, "a grand jury is neither an officer nor an agent of the United States, but a part of the court." *Falter* v. *United States,* 23 F. 2d 420, 425 (CA2), cert. denied, 277 U. S. 590 (1928). This Court has similarly characterized the grand jury:

> "A grand jury is clothed with great independence in many areas, but it remains an appendage of the court, powerless to perform its investigative function without the court's aid, because powerless itself to compel the testimony of witnesses. It is the court's process which summons the witness to attend and give testimony, and it is the court which must compel a witness to testify if, after appearing, he refuses to do so." *Brown* v. *United States,* 359 U. S. 41, 49 (1959).

See also *Blair* v. *United States,* 250 U. S. 273, 280 (1919) ("At the foundation of our Federal Government the inquisitorial function of the grand jury and the compulsion of witnesses were recognized as incidents of the judicial power of the United States"); *United States* v. *Calandra,* 414 U. S. 338, 346, and n. 4 (1974).

This Court has, of course, long recognized that the grand jury has wide latitude to investigate violations of federal law as it deems appropriate and need not obtain permission from either the court or the prosecutor. See, *e. g., id.,* at 343; *Costello* v. *United States,* 350 U. S. 359, 362 (1956); *Hale* v. *Henkel,* 201 U. S. 43, 65 (1906). Correspondingly, we have acknowledged that "its operation generally is unrestrained

by the technical procedural and evidentiary rules governing the conduct of criminal trials." *Calandra,* 414 U. S., at 343. But this is because Congress and the Court have generally thought it best not to impose procedural restraints on the grand jury; it is not because they lack all power to do so.[10]

To the contrary, the Court has recognized that it has the authority to create and enforce limited rules applicable in grand jury proceedings. Thus, for example, the Court has said that the grand jury "may not itself violate a valid privilege, whether established by the Constitution, statutes, or the common law." *Id.,* at 346. And the Court may prevent a grand jury from violating such a privilege by quashing or modifying a subpoena, *id.,* at 346, n. 4, or issuing a protective order forbidding questions in violation of the privilege, *Gravel* v. *United States,* 408 U. S. 606, 628–629 (1972). Moreover, there are, as the Court notes, *ante,* at 49, a series of cases in which we declined to impose categorical restraints on the grand jury. In none of those cases, however, did we question our power to reach a contrary result.[11]

Although the Court recognizes that it may invoke its supervisory authority to fashion and enforce privilege rules applicable in grand jury proceedings, *ibid.,* and suggests that

---

[10] Indeed, even the Court acknowledges that Congress has the power to regulate the grand jury, for it concedes that Congress "is free to prescribe" a rule requiring the prosecutor to disclose substantial exculpatory evidence to the grand jury. *Ante,* at 55.

[11] In *Costello* v. *United States,* 350 U. S. 359, 363 (1956), for example, the Court held that an indictment based solely on hearsay evidence is not invalid under the Grand Jury Clause of the Fifth Amendment. The Court then rejected the petitioner's argument that it should invoke "its power to supervise the administration of justice in federal courts" to create a rule permitting defendants to challenge indictments based on unreliable hearsay evidence. The Court declined to exercise its power in this way because "[n]o persuasive reasons are advanced for establishing such a rule. It would run counter to the whole history of the grand jury institution, in which laymen conduct their inquiries unfettered by technical rules. Neither justice nor the concept of a fair trial requires such a change." *Id.,* at 364.

it may also invoke its supervisory authority to fashion other limited rules of grand jury procedure, *ante*, at 48–49, it concludes that it has no authority to *prescribe* "standards of prosecutorial conduct before the grand jury," *ante*, at 46–47, because that would alter the grand jury's historic role as an independent, inquisitorial institution. I disagree.

We do not protect the integrity and independence of the grand jury by closing our eyes to the countless forms of prosecutorial misconduct that may occur inside the secrecy of the grand jury room. After all, the grand jury is not merely an investigatory body; it also serves as a "protector of citizens against arbitrary and oppressive governmental action." *United States* v. *Calandra*, 414 U. S., at 343. Explaining why the grand jury must be both "independent" and "informed," the Court wrote in *Wood* v. *Georgia*, 370 U. S. 375 (1962):

> "Historically, this body has been regarded as a primary security to the innocent against hasty, malicious and oppressive persecution; it serves the invaluable function in our society of standing between the accuser and the accused, whether the latter be an individual, minority group, or other, to determine whether a charge is founded upon reason or was dictated by an intimidating power or by malice and personal ill will." *Id.*, at 390.

It blinks reality to say that the grand jury can adequately perform this important historic role if it is intentionally misled by the prosecutor—on whose knowledge of the law and facts of the underlying criminal investigation the jurors will, of necessity, rely.

Unlike the Court, I am unwilling to hold that countless forms of prosecutorial misconduct must be tolerated—no matter how prejudicial they may be, or how seriously they may distort the legitimate function of the grand jury—simply because they are not proscribed by Rule 6 of the Federal Rules of Criminal Procedure or a statute that is applicable

in grand jury proceedings. Such a sharp break with the traditional role of the federal judiciary is unprecedented, unwarranted, and unwise. Unrestrained prosecutorial misconduct in grand jury proceedings is inconsistent with the administration of justice in the federal courts and should be redressed in appropriate cases by the dismissal of indictments obtained by improper methods.[12]

## III

What, then, is the proper disposition of this case? I agree with the Government that the prosecutor is not required to place all exculpatory evidence before the grand jury. A grand jury proceeding is an *ex parte* investigatory proceeding to determine whether there is probable cause to believe a violation of the criminal laws has occurred, not a trial. Requiring the prosecutor to ferret out and present all evidence that could be used at trial to create a reasonable doubt as to the defendant's guilt would be inconsistent with the purpose of the grand jury proceeding and would place significant burdens on the investigation. But that does not mean that the prosecutor may mislead the grand jury into believing that there is probable cause to indict by withholding clear evidence to the contrary. I thus agree with the Department of Justice that "when a prosecutor conducting a grand jury inquiry is personally aware of substantial evidence which directly negates the guilt of a subject of the investigation, the prosecutor must present or otherwise dis-

---

[12] Although the Court's opinion barely mentions the fact that the grand jury was intended to serve the invaluable function of standing between the accuser and the accused, I must assume that in a proper case it will acknowledge—as even the Solicitor General does—that unrestrained prosecutorial misconduct in grand jury proceedings "could so subvert the integrity of the grand jury process as to justify judicial intervention. Cf. *Franks* v. *Delaware,* 438 U. S. 154, 164–171 (1978) (discussing analogous considerations in holding that a search warrant affidavit may be challenged when supported by deliberately false police statements)." Brief for United States 22, n. 8.

close such evidence to the grand jury before seeking an indictment against such a person." U. S. Dept. of Justice, United States Attorneys' Manual ¶ 9–11.233, p. 88 (1988).

Although I question whether the evidence withheld in this case directly negates respondent's guilt,[13] I need not resolve my doubts because the Solicitor General did not ask the Court to review the nature of the evidence withheld. Instead, he asked us to decide the legal question whether an indictment may be dismissed because the prosecutor failed to present exculpatory evidence. Unlike the Court and the Solicitor General, I believe the answer to that question is yes, if the withheld evidence would plainly preclude a finding of probable cause. I therefore cannot endorse the Court's opinion.

More importantly, because I am so firmly opposed to the Court's favored treatment of the Government as a litigator, I would dismiss the writ of certiorari as improvidently granted.

---

[13] I am reluctant to rely on the lower courts' judgment in this regard, as they apparently applied a more lenient legal standard. The District Court dismissed the indictment because the "information withheld raises reasonable doubt about the Defendant's intent to defraud," and thus "renders the grand jury's decision to indict gravely suspect." App. to Pet. for Cert. 26a. The Court of Appeals affirmed this decision because it was not "clearly erroneous." 899 F. 2d 898, 902–904 (CA10 1990).